### HILMAR STEPHANY
*v.*
### GUSTAV CASTAN *et al.*

*Opinion filed November 1, 1897.*

CONTRACTS—*promise to pay money conditioned on act of third party— when not enforceable.* An obligation to pay money, which is made dependent upon the act of a third party over whom neither party to the obligation has control, cannot be enforced unless the specified act upon which the promise is conditioned is fully performed.

*Stephany* v. *Castan*, 68 Ill. App. 552, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. ABNER SMITH, Judge, presiding.

NEWMAN, NORTHRUP & LEVINSON, for appellant.

SIGMUND ZEISLER, for appellees.

Per CURIAM: This was an action of assumpsit, brought by Hilmar Stephany, against Gustav Castan and Louis Castan. By agreement a jury was waived and a trial had before the court, which resulted in a judgment in favor of the defendants. The plaintiff appealed to the Appellate Court, where the judgment was affirmed.

The same briefs and arguments have been filed here which were filed in the Appellate Court, but after a careful examination of the same we perceive no ground for disturbing the judgment of the Appellate Court. The judgment of the Appellate Court will be affirmed and the following opinion rendered by that court will be adopted as the opinion of this court:

SHEPARD, J.: "The Columbian Moorish Palace Company was a corporation organized for the exhibition of wax figures and optical illusions at the World's Fair in Chicago. Four persons were its promoters, viz., the appellant, and Messrs. Zeisler, Hoffman and Hamburger. The appellees, Castan Bros., resided in Berlin, Germany, and were manufacturers and exhibitors of wax figures. In August, 1892, a written agreement between Castan Bros. and the said Moorish Palace Company was entered into at Berlin, whereby the former sold to the latter, for 183,260 reichmarks, (equal to about $44,000,) certain articles then contained in the Panopticum, conducted by Castan Bros., in Hamburg, Germany, and certain other articles to be manufactured by Castan Bros., to be paid for as follows:

"'*Clause 6.*—The terms of payment are as follows: One-half of the above mentioned total purchase price must be deposited October 1, 1892, at the Deutsche Bank at Berlin or at the National Bank of Illinois at Chicago, and shall be paid over to Castan Bros. on their delivery

to the Columbian Moorish Palace Company of a document transferring to it the ownership in the articles situated at Hamburg, hereinabove mentioned; for the other half of the purchase price Castan Bros. agree to accept shares of the capital stock of the Columbian Moorish Palace Company for their full nominal value, in the stead of payment. Said shares are to be deposited either at the Deutsche Bank at Berlin or at the National Bank of Illinois at Chicago, for the benefit of Castan Bros., with instructions to the banks, respectively, that the same are to be delivered to Castan Bros. as soon as the articles at Berlin and Hamburg are accepted by a trusted agent to be named by the company, and are delivered to the forwarding agent to be designated by the company, and the receipt of the forwarding agent shall serve to the respective banks as evidence of delivery. The said company herewith guarantees that the total capital stock issued by it is not larger than three hundred thousand dollars ($300,000).'

"In September, 1892, the appellant was in Saxony, and on the 10th of that month received a cablegram from the Chicago banker, as follows:

" 'CHICAGO, *September 9, 1892.*

" '*Hilmar Stephany, Wittgen, Prussia, Saxony:*

" 'Bond subscribers refuse going on Moorish Palace unless everybody gives up half stock; Hamburger, Hoffman and Zeisler consented; cable authority likewise; otherwise everything lost.
WASSMANSDORF.'

"Shortly after receiving the dispatch the appellant went to Berlin to see Castan Bros., and he testified that he there said to them, among other things: 'I know you are deeply in this concern as contractors and stockholders, and that if I do not consent to give up half of my stock, which I feel just now like not doing because I do not wish to be imposed upon, your investment so far, which amounts to about 50,000 marks, will be lost to you. If I consent to give up half of my stock I must get some equivalent for it, because I have spent all my ready cash

in the promotion of this enterprise and I am now here without funds. Now, if I am compelled to give up half of my stock I want some compensation for it. Now, is it of sufficient interest to you to see the concern carried on? Then we will make an agreement. * * * You have a contract for 200,000 marks. You have so far invested in buying materials about 50,000 marks or 60,000 marks, which will be a dead loss to you unless the contract is carried out, and it simply depends on my say-so whether the company will go on or the whole thing go up in smoke.'

"The result of the interview and conversation is stated by appellant, as follows: 'In talking over the matter we ultimately agreed that they would pay me 5000 marks if I would consent to cancel half of my stock. I had $40,000 worth of stock at that time, face value.' The parties thereupon entered into the following writing:

" 'We have bound ourselves to pay Mr. Hilmar Stephany the sum of 5000 marks, only under the condition that the contract with the Columbian Moorish Palace Company of Chicago, requiring payment of the first installment in cash in the beginning of October of this year, will be punctually kept. Mr. Hilmar Stephany binds himself to return to Castan Bros. the sum of 5000 marks as soon as stock of the above company reaches par.

HILMAR STEPHANY.

September 12, 1892.               GEBRUEDER CASTAN.'

—"And such writing formed the basis of the suit brought by appellant against the appellees, and from the judgment therein in favor of the appellees this appeal is prosecuted. No part of the 5000 marks mentioned in the writing of September 12, 1892, was ever paid.

"In considering the effect of the writing between the parties it is necessary to read it in connection with the contract between Castan Bros. and the Moorish Palace Company. By the terms of that contract two payments were to be made, and only two, by the Palace company: One of $22,000 in cash (one-half of 183,260 reichmarks) by a deposit of that amount at the Deutsche Bank in Berlin

or at the National Bank of Illinois in Chicago, 'by October 1, 1892,' and the other, or an equal amount, at its nominal (par) value of the capital stock of the Palace company when the bargained goods should be accepted by an agent of the company.

"By the terms of the writing between the parties to this suit the appellees bound themselves to pay the 5000 marks to the appellant 'only under the condition that the contract with the Columbian Moorish Palace Company, Chicago, requiring the payment of the first installment in cash in the beginning of October of this year, will be punctually kept.' Such condition refers manifestly to the cash payment of $22,000 to be deposited by the Palace company for the appellees 'by October 1, 1892,' and its punctual payment was the essence of the promise to pay the 5000 marks. The inquiry that ensues is, was such deposit made? The deposit of $22,000 was made by the Palace company on October 6, 1892, but upon conditions variant from those provided by the contract between Castan Bros. and the Palace company. On September 13, 1892, the board of directors of the Palace company adopted a resolution without the sanction or knowledge, until subsequently, of Castan Bros., as follows:

" '*Resolved*, That the secretary be and he is hereby instructed to notify Castan Bros., at Berlin, that this company refuses to pay over to Castan Bros. the sum of $22,000 or thereabouts on October 1, 1892, but instead will deposit said sum of money, together with a certificate of 220 shares of the capital stock of this company, in the National Bank of Illinois, at Chicago, such money and such certificate to be paid over and delivered, respectively, to said Castan Bros. upon the delivery by them of the articles purchased, as described in contract of August 18, 1892.'

"Such resolution, or its effect, was, under instructions to the secretary of the Palace company, communicated to Castan Bros., and was something like a request for their consent to the modification of the contract from a deposit as payment to one as security. Probably after the letter

of the secretary reached Castan Bros., although not certainly so, they cabled to the Palace company a dispatch, which was received on October 4 or 5, 1892, as follows: 'Have ascertained deposit National Bank Illinois not made as promised in your letter. First make deposit, then talk about terms.' Subsequently to the receipt of that cablegram the Palace company deposited, on October 6, 1892, in the National Bank of Illinois, $22,000, upon the terms designated in its certificate of deposit, as follows: 'The National Bank of Illinois certifies that it has received this day, namely 6th of October, 1892, from the Columbian Moorish Palace Company, the sum of $22,000, which sum is to be held by it as security for the payment to Castan Bros. of the sum of $22,000 as soon as they shall have delivered to the forwarding agent to be designated by the Columbian Moorish Palace Company, the articles purchased and ordered by the Columbian Moorish Palace Company of Castan Bros., as per contract of August 18, 1892.'

"It will be seen by comparison that the terms recited in the certificate are substantially like those in the resolution of the directors of the Palace company concerning the money being as security for the payment to Castan Bros. and not as the payment itself. Apparently Castan Bros. were paid one-half of the $22,000 some time in November, 1892, and the balance in February, 1893.

"We will not discuss the argument that the payment of $22,000 to Castan Bros. depended upon the tender to them of a bill of sale of the articles contained in the Panopticum at Hamburg, or, in other words, that the tender of such a bill of sale was a condition precedent to payment being made, further than to say that before the time of payment had arrived, the Palace company had, by resolution, refused to make the deposit as a payment, and further, that the Palace company never appear to have made any such claim. It is also doubtful if any tender of a bill of sale were, otherwise, necessary. It could

have been no more than a formality, at best. The first clause of the contract was, in itself, a bill of sale of the goods for future delivery in January and February, 1893, and required nothing further than a delivery of the goods to vest a perfect title in possession to the bargained articles. Nor is it necessary, in the view we take of the case, to consider the question of consideration for the agreement by Castan Bros. to pay appellant 5000 marks. We prefer to rest our decision upon the sole ground that, as between the appellant and Castan Bros., the promise by the latter was but a conditional one, and that the condition was not performed. The facts that we have stated need not be repeated.

"Where an obligation to pay money is dependent on the action of a third person, over whom neither party to the obligation has control, such payment cannot be exacted unless the specific act be performed. (*Miller* v. *Wilson*, 37 Ill. App. 399.) The condition, here, that the Palace company should punctually make the payment of $22,000, goes to the whole promise by the appellees, and the promise fell with the failure of the condition.

"The case of *Cincinnati S. & C. Railroad Co.* v. *Bensley*, 51 Fed. Rep. 738, is in point, the opinion there being delivered by Mr. Justice BROWN, now of the United States Supreme Court. While there, as here, some 'fireside' equitable facts appear, they are not such as a court of law can enforce. Appellant, as shown by his own testimony, drove a sharp bargain with the appellees under the cover of circumstances or a situation to which he held the key, and he cannot complain, in law, if the appellees have chosen, as they were entitled to do, to stand upon the letter of their promises.

"The judgment of the circuit court in favor of the appellees was right. It will therefore be affirmed."

*Judgment affirmed.*